Maureen CIOFFI, Appellee

v.

Fred W. CIOFFI, Appellant.

Superior Court of Pennsylvania.

Submitted March 7, 2005.

Filed Sept. 7, 2005.

Reargument Denied Nov. 10, 2005.

Gail E. Suhr, Mars, for appellant.

Robert A. Felkay, Pittsburgh, for appellee.

Before: DEL SOLE, P.J., FORD ELLIOTT and TAMILIA, JJ.

TAMILIA, J.:

¶ 1 Husband, Fred W. Cioffi appeals from the August 9, 2004 Order granting the petition to enforce Qualified Domestic Relations Orders filed on behalf of appellee-wife and entitling her to a marital portion of husband's Boilermaker and Teamsters pensions pursuant to the parties' Property Settlement Agreement. After careful review, we reverse and remand for proceedings consistent with this Opinion.

¶ 2 The trial court set forth the relevant facts and procedural history as follows:

The parties were married on June 17, 1978 and divorced on August 12, 1994. As part of the divorce, the parties executed a Property Settlement Agreement, which provides at paragraph 7 as follows:

"The parties acknowledge that the marital estate includes Husband's pension interest under the Teamster's Local Union No. 211, Pittsburgh Press Company Pension, and the Boilermaker's Retirement Account. To implement this Agreement, the parties shall enter into a qualified domestic relation order assigning to Wife sixty (60%) percent of the marital portion of Husband's benefit accrued

through March 1, 1990." *Paragraph 7, Property Settlement Agreement*

Pursuant to the above, the parties executed two separate Qualified Domestic Relation Orders dated July 22, 1994 for the Boilermaker–Blacksmith National Pension Trust (hereinafter "Boilermaker Plan") and the Teamsters Local No. 211 Pension Plan (hereinafter "Teamsters Plan"). Husband worked in "covered employment" under the Teamsters Plan from March 16, 1987 through March 1, 2000. It is unclear from the record the period of time that he worked under the Boilermaker Plan.

Husband was awarded Social Security disability beginning November, 1999 based on a determination that he became disabled on May 3, 1999.[1] On December 9, 1999, Husband applied for a pension with the Boilermaker Plan. The pension application completed by Husband indicated that: "...I want to retire on a ...DISABILITY PENSION (NO AGE REQUIREMENT)." (Ex. 11) Husband was notified that his application was approved by a letter of January 26, 2000 granting him a disability pension benefit of $875.67 per month effective November 1, 1999. (Ex. 12).

On February 8, 2000, Husband completed an Application for Disability Benefits under the Teamsters Plan. Husband's application to the Teamsters Plan stated: "I hereby apply for payment of a disability benefit under the Plan." (Ex. 4) Husband began receiving a monthly disability benefit under the Teamsters Plan effective March 1, 2000 in the amount of $1,425.00. (Ex. 5)

Husband failed to notify Wife that he was receiving payments from either pension plan. In fact, Husband specifically stated on the pension application to the Boilermaker Plan that he was not covered by any domestic relations order

which would affect his benefits. In 2002, Wife apparently learned that Husband was receiving benefits under the pension plans and therefore resubmitted the QDRO to the Boilermaker Plan. As a result, the Boilermaker Plan began to make payment to Wife of a portion of Husband's monthly benefit. (Ex. 13) The Teamsters Plan, despite being notified of the QDRO, never made any payment to Wife.

In December 2003, Wife filed the Petition to Enforce Qualified Domestic Relation Orders alleging that Husband was collecting benefits under the pension plans to which she was entitled pursuant to the parties Property Settlement Agreement. A hearing was held on June 22, 2004 at which time the parties stipulated to the Property Settlement Agreement, the QDRO's of July 22, 1994, the applications and receipt of the benefits under the pensions, the documentation for the Teamsters Plan and the Boilermaker Plan, and the Social Security disability award.

Based on the evidence of record, this Court entered its Order of August 9, 2004, which found that the benefits that Husband was receiving pursuant to his pension with both plans were marital assets. Further, Husband owed Wife $17,061.88 from Husband's pension with the Boilermaker Plan. The Plan was ordered to begin payment to Wife, effective September 1, 2004 at the rate of 60% of the monthly benefit in accordance with the QDRO and an additional 15% to reimburse her for the $17,061.88. This Court further ordered that Husband owed Wife $50,880.00 from the Teamsters Plan and, effective September 1, 2004, the Teamsters Plan was to pay Wife 60% of the monthly benefit and an additional 15% to reimburse her for the $50,880.00. Husband's request to discontinue Wife's receipt of benefits

from the Boilermaker Plan was denied as well as Wife's request for counsel fees. Husband filed a timely appeal.

---

[1] The nature and extent of Husband's disability is not set forth in the record. Husband is disabled as determined by the Social Security Administration. Both plans require a determination of disability by the Social Security Administration in order for a participant to be eligible for a disability pension. (Teamster Plan, Article III, 3.4; Boilermaker Plan, Ex. 8, p. 28)

Trial Court Opinion, Todd, J., 11/22/04, at 2–3.

¶ 3 On appeal, husband raises five issues for our review:

A. Whether the lower court erred by finding that the Husband's post-divorce disability benefits were a marital asset to be divided between the parties?

B. Whether the lower court erred in awarding to Wife a portion of Husband's post-divorce disability benefits when the parties waived any right to alimony, maintenance, and support in their marital Property Settlement Agreement?

C. Whether the lower court erred in failing to consider that the marital portion of Husband's retirement pension benefits divided between the parties in their Property Settlement Agreement have in no way been disturbed, distributed, or in any way dissipated by Husband's post-divorce receipt of disability benefits, and the uncondradicted evidence shows that Wife will receive her total, unaltered distribution of Husband's retirement pensions as agreed by the parties in their Property Settlement Agreement when Husband retires?

D. Whether the trial court erred in failing to consider that Husband's

disability benefits will extinguish if Husband returns to work?

E. Whether the lower court erred in awarding to Wife 75% of Husband's monthly disability benefits, leaving disabled Husband to live and subsist off of 25% of the allowance?

Appellant's brief at 4.

¶ 4 "The determination of marital property rights through prenuptial, postnuptial and settlement agreements has long been permitted, and even encouraged." *Sabad v. Fessenden,* 825 A.2d 682, 686 (Pa.Super.2003) (citation omitted). In reviewing a court's Order to uphold a marital property settlement agreement, we are limited to determining whether the trial court clearly abused its discretion or committed an error of law. *See Busch v. Busch,* 732 A.2d 1274 (Pa.Super.1999); *Holz v. Holz,* 850 A.2d 751 (Pa.Super.2004). If the trial court's determination is supported by the record, we may not substitute our own judgment for that of the trial court nor "usurp the trial court's factfinding function." *Holz, supra* at 757 (citations omitted).

¶ 5 In this case, the parties entered into a marital property settlement agreement which specifically addresses the distribution of husband's pension plan income. In relevant part, the Property Settlement Agreement provides:

"The parties acknowledge that the marital estate includes Husband's pension interest under the Teamsters Local Union No. 211, Pittsburgh Press Company Pension and the Boilermaker's Retirement Account. To implement this agreement, the parties shall enter into a qualified domestic relations order assigning to Wife sixty percent (60%) of the marital portion of Husband's benefit accrued through March 1, 1990."

Trial Court Opinion at 2, *quoting* Property Settlement Agreement at 5; paragraph 7.

¶ 6 The law in Pennsylvania with regard to property settlement agreements is well-settled. Generally, courts in this Commonwealth possess the broad authority to enforce the terms of a parties' property settlement agreement. *See* 23 Pa. C.S.A. § 3502, **Equitable division of marital property,** (e) **Powers of the court.** In *Bianchi v. Bianchi,* 859 A.2d 511 (Pa.Super.2004), we concluded:

In Pennsylvania, we enforce property settlement agreements between husband and wife in accordance with the same rules applying to contract interpretation. A court may construe or interpret a consent decree as it would a contract, but it has neither the power nor the authority to modify or vary the decree unless there has been fraud, accident or mistake.

. . .

It is well-established that the paramount goal of contract interpretation is to ascertain and give effect to the parties' intent. When the trier of fact has determined the intent of the parties to a contract, an appellate court will defer to that determination if it is supported by the evidence. Further, where as here, the words of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the express language of the agreement itself.

*Id.* at 515 (citations omitted).

¶ 7 The trial court classified the disability payments husband receives under the Boilermaker and Teamsters Plans as pension interests subject to equitable distribution. "The Boilermaker Plan describes various types of pension that are available to the participants. These include:

1. "Age Pension"
2. "Early Retirement Pension"

3. "Disability Pension"
4. "Vested Pension" and
5. "Alternative Vested Pension".

Likewise, the Teamsters Plan indicates that there is a pension for:
1. "Normal Retirement"
2. "Early Retirement"
3. "Deferred Vested Pension" and
4. "Disability Benefits.'"

Trial Court Opinion at 5, *citing* Boilermaker Plan at 20; Teamsters Plan at 5–10.

¶ 8 Husband argues that the disability payments he receives under both the Boilermakers and Teamsters Plans are not ᴏmarital assets subject to distribution within the meaning of the parties' Property Settlement Agreement. Appellant's brief at 9. Additionally, husband contends the court erred in failing to consider that the marital portion of husband's receipt of the disability pension plan payments will not diminish the amount wife receives when husband's payments are later characterized as retirement benefits. *Id.* at 13. After careful review and consideration, we agree.

▮ ¶ 9 It is well-settled that disability payments are not per se excluded from the definition of marital property for equitable distribution purposes. *Drake v. Drake*, 555 Pa. 481, 725 A.2d 717 (1999). Rather, a pure disability benefit will qualify as a martial asset subject to equitable distribution only when it cannot be separated from other proceeds that form part of the marital estate. *Ciliberti v. Ciliberti*, 374 Pa.Super. 228, 542 A.2d 580 (1988); *see also Kozich v. Kozich*, 397 Pa.Super. 463, 580 A.2d 390 (1990) (disability payments are only subject to equitable distribution when they cannot be separated from other proceeds that form part of the marital estate); *Hayward v. Hayward*, 428 Pa.Super. 332, 630 A.2d 1275 (1993) (disability payments are not subject to equita-

ble distribution unless they can be fairly characterized as retirement pension benefits or some other form of marital property).

¶ 10 This Court recently analyzed the scope of disability payments in *Moore v. Moore*, 710 A.2d 633 (Pa.Super.1998). *Moore* involved a husband and wife who separated after nearly twenty-five years of marriage. The husband had suffered a work-related injury to his lower back and received workers compensation benefits for nearly two years prior to the parties' separation. In December 1991, the husband received a one-time lump sum payment of $89,602.50 to settle his workers' compensation claim. The trial court concluded that the husband's workers' compensation commutation award was marital property subject to distribution, and we reversed, noting:

> Such benefits are intended to compensate the employee spouse for lost earning capacity. They are paid in lieu of the earnings which would have been paid to the employee if he or she had been able to work. They replace the future salary or wages which the employee, because of physical or mental disability, will not be able to earn. *They are comparable to Workmen's Compensation disability payments. Post-divorce payments intended to compensate for an inability to work are not marital property.*

*Moore, supra* at 635 (citations omitted; emphasis in original).

¶ 11 Similarly, in this case, we cannot reasonably conclude that it was the true intent of the parties that disability payments made to husband prior to him reaching retirement age would qualify as marital assets within the meaning of the parties' Property Settlement Agreement. Rather, husband's current disability pay

functions as a substitute for earned income, and not an age retirement pension benefit. The Property Settlement Agreement was executed by the parties in August 1994 as part of their divorce, well-before husband was declared disabled on May 3, 1999. Husband was born on January 3, 1949, making him just 50 years old at the time he became disabled, and wife, having been born some ten years later, was just 40. Based on the language of both the Property Settlement Agreement and the QDROs, we find the actual intent of the parties was for wife to collect a portion of benefits payable to husband at the time he reaches normal retirement age. We do not find it reasonable to conclude the parties were anticipating that husband would become disabled and collect disability benefits at the relatively young age of 50 and that wife, therefore, would benefit financially by collecting a portion of husband's "retirement" benefits at the age of 40. In support of this conclusion we point out paragraphs D1 and 4–5 of the QDROs which give wife the option of collecting her marital share of husband's pension in "an amount equal to sixty percent (60%) of the monthly pension and/or death benefits" at any time after husband is eligible to collect, i.e. retirement age. Record, Nos. 73, 74. Moreover, when husband does reach retirement age, wife will collect the same amount under the Teamsters Plan (the QDRO anticipated amount) that she would have collected had husband not been so unfortunate as to become disabled.

¶ 12 Under the Teamsters Plan, it is specifically indicated that service credit is earned for months during which "no contribution is made [to the Pension Plan] when due to your absence from work for one of the following reasons:

. . .

● your receipt of disability benefits under the Pension Plan."

Teamsters Plan at 14. Similarly, the Boilermaker's Plan discusses "Disability Pension" in an entirely separate section from "Age Pension" (granted at age 65 or older) and clarifies the difference between the two prior to the candidate reaching retirement age.

> When a Disability Pensioner reaches age 65, pension benefits automatically become an Age Pension and continue for the remainder of the Pensioner's lifetime even if the Pensioner recovers from the disability.

Boilermaker Plan at 20, 29. By classifying husband's disability benefits as a "pension interest" under paragraph 7 of the parties' Property Settlement Agreement, the trial court has reallocated husband's disability benefits and, due to husband's misfortune, unjustly rewarded wife with a windfall to which she is not entitled. Further, we query whether wife would have claimed entitlement to obviously temporary disability payments had husband suffered a stroke, heart attack or similar illness or injury which kept him from working for just months instead of years? And if the situation was reversed would disability payments stemming from pregnancy also be subject to distribution under a QDRO? We do not believe so. Disability benefits which accrue following a property settlement agreement, which are clearly separate and apart from anticipated retirement benefits, and which can be separated from other proceeds that form part of the marital estate are not subject to distribution under a QDRO which is ordered in furtherance of an equitable distribution of retirement benefits. Accordingly, we reverse and remand for proceedings consistent with this Opinion, including but not limited to the return of any monies improperly paid to wife.

¶ 13 Order reversed; case remanded.

¶ 14 Jurisdiction relinquished.

¶ 15 FORD ELLIOTT, J., files a Dissenting Statement.

FORD ELLIOTT, J., dissenting:

¶ 1 I respectfully dissent. I believe based on the unambiguous language contained in the martial property settlement agreement between the parties and the two QDROs executed by the parties that Wife is entitled to 60% of the marital portion of each of Husband's two pensions. This court has previously held that a basic tenet of contract law is that when the language of a contract is clear and unambiguous its meaning must be determined by an examination of the content of the contract itself. Therefore, it is axiomatic that this Court "must construe the contract only as written and may not modify the plain meaning under the guise of interpretation." *Little v. Little*, 441 Pa.Super. 185, 657 A.2d 12, 15 (1995) quoting *McMahon v. McMahon*, 417 Pa.Super. 592, 612 A.2d 1360, 1364 (1992). Furthermore, it is well-recognized that "[a]bsent fraud, misrepresentation, or duress, spouses should be bound by the terms of their agreements." *McMahon, supra* at 1363. (citations omitted). The parties' property settlement agreement states: "7. The parties acknowledge that the marital estate includes *Husband's pension interest* under the Teamsters Local Union No. 211, Pittsburgh Press Company Pension and the Boilermaker's Retirement Account." (emphasis added.) Both pension plans describe various types of pensions that are available to participants. The terms "Disability Pension" and "Disability Benefits" are listed under the types of pension plans. There is no language in the parties' agreement that differentiates between disability retirement benefits or any other retirement benefits.

¶ 2 I would affirm the order of the trial court.